ANDY GALEA'I, Plaintiff

v.

FIAVIVINI ATOFAU, Defendant

High Court of American Samoa
Trial Division

CA No. 72-89

August 20, 1990

Before REES, Associate Justice, TAUANU'U, Chief Associate Judge, and MATA'UTIA, Associate Judge.

Counsel: For Plaintiff, Charles V. Ala'ilima
 For Defendant, Steven H. Watson

This is an action for damages arising out of a battery.

Although plaintiff and defendant told vividly contrasting stories, a few facts are undisputed. On October 12, 1987, defendant beat plaintiff with the stock end of a rifle or shotgun. Plaintiff suffered a compound fracture of his left arm, a fracture in the right wrist, and a dislocated left elbow. He was hospitalized for several days and underwent surgery. Plaintiff now has a metal plate and pins in his left arm, some scarring, and residual difficulty with the use of the left arm which could probably be improved by another operation.

Defendant was charged with Assault in the First Degree. He was bound over to the High Court on this charge after a preliminary examination to determine probable cause. Defendant eventually pled guilty to Assault in the Third Degree. The Court questioned the defendant to ascertain that there was a factual basis for the guilty plea, entered a judgment of conviction, and imposed a six month prison term. Defendant now maintains, however, that his actions were justified as reasonably necessary to defend himself and his property.

Plaintiff's testimony is that on October 12 he was driving with his three young children along a mountain road toward the village of Leone from some land he believes to be owned by his family. The engine on his vehicle died. After coasting downhill for a while he came to a flat place in the road and the car came to a stop. As plaintiff was getting out to inspect the engine, another car came along. This car contained the defendant and some young men or teenaged boys. The defendant --- with whom plaintiff had recently had some unpleasant words --- shouted something offensive. Then defendant's car stopped a few feet ahead of plaintiff's car.

Defendant and the other occupants got out, and defendant walked toward plaintiff carrying a rifle or shotgun. Plaintiff was afraid he would be shot, but instead the defendant used the gun as a club. Plaintiff put up his arm to try to protect his face; defendant hit this arm with the gun until plaintiff could no longer hold it up; then he put up the other arm and defendant hit that one too. The blows were severe enough not only to fracture plaintiff's arms but also to break the rifle stock. Plaintiff was also hit by a rock thrown by one of the boys who was with defendant. Eventually he fell to the ground and defendant walked away.

Defendant's version is that when his car and that of plaintiff passed each other, they almost collided. He shouted to plaintiff to watch the road, plaintiff shouted out a curse or insult, and he shouted back at plaintiff in a similar vein. Then he saw plaintiff's car coming to a stop. Defendant took this as an invitation to fight and decided it was time to have it out. Seeing that plaintiff was carrying a knife, defendant took his gun with him. He walked up to the plaintiff, who swung the knife at him and missed. Defendant then began hitting plaintiff with the gun. His objective was to take the knife away, but in order to do this it was necessary first to knock down plaintiff's left arm. When plaintiff finally lowered his left arm, defendant hit plaintiff's right arm once with the gun. The knife fell to the ground. Defendant retrieved it and left the scene.

Defendant presented into evidence a knife he claims to be the one he took from plaintiff. It is a "cane knife," shorter and somewhat broader than the "bush knife" or machete more commonly carried in Samoa, with a curved or hooked blade. (Although defendant's counsel lays great stress on the unusual shape of the "cane knife," the one introduced into evidence does not impress the Court as being any more dangerous or frightening than an ordinary bush knife.) Plaintiff testified that he did once have a knife something like this, which has since been

lost, but that the one introduced into evidence is not it. He denies having had a knife or a weapon of any kind when he was beaten by defendant.

## I. *Collateral Estoppel*

Plaintiff contends that defendant is estopped by his guilty plea and by the ensuing criminal conviction from asserting in the present action that he acted in self-defense.

The effect of a guilty plea in a criminal case upon a subsequent action for damages appears to be a question of first impression in American Samoa. We therefore requested counsel to research the law of other jurisdictions and submit post-trial memoranda. Plaintiff has cited a number of authorities in support of the proposition that a guilty plea does estop the defendant in a subsequent civil action. Defendant has submitted a quotation from American Jurisprudence 2d, to the effect that a guilty plea does not estop the defendant from presenting the defense of justification in the subsequent civil case, "because of want of mutuality"; and a citation for Corpus Juris Secundum to the same effect.

The doctrine that estoppel requires "mutuality," however, is no longer generally regarded as part of the law. *See, e.g., Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322 (1979); *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313 (1972); Restatement (Second) of Judgments §§ 29, 85(2) (1980); *cf. Puailoa v. Estate of Lagafuaina*, 11 A.S.R.2d 54, 76 (1989) ("The doctrine of collateral estoppel sometimes bars relitigation of issues even where the facts or the parties are somewhat different in the new case than in the old.")

The doctrine of mutuality was unrelated to defendant's contention in the present case, which is that a guilty plea entered as a result of a plea bargain should not necessarily be regarded as a true statement. Rather, the mutuality requirement was "[b]ased on the premise that it is somehow unfair to allow a party to use a prior judgment when he himself would not be so bound." *Parklane*, 439 U.S. at 327. Thus, even in the heyday of the mutuality doctrine, the government could sue a convicted criminal for civil damages and the defendant would be estopped to deny the facts entailed by his conviction. *See, e.g., Local 167, International Brotherhood of Teamsters v. United States*, 291 U.S. 293 (1934). Indeed, should the defendant so much as file a pleading inconsistent with his prior criminal conviction, the civil court would strike the pleading as "false and sham," because the

79

defendant "could not require proof of what had been duly adjudged between the parties." *Id.* at 298-99. The estoppel applied whether defendant's conviction had resulted from a trial or from a guilty plea. *Fontneau v. United States*, 654 F.2d 8 (1st Cir. 1981); *Plunkett v. Commissioner of Internal Revenue*, 465 F.2d 299 (7th Cir. 1972). A defendant was estopped even though his guilty plea was induced by a plea bargain, and even though the bargain might have been a most attractive one. *Plunkett*, 465 F.2d at 305-06.

It follows from the abandonment of the mutuality requirement that individual victims of crime can now benefit from collateral estoppel in the same ways and to the same extent that the government has always done. Most recent cases support this logical result. *See, e.g., In re Raiford*, 695 F.2d 521 (11th Cir. 1983); *Wolfson v. Baker*, 623 F.2d 1074 (5th Cir. 1980); *Nathan v. Tenna Corp.*, 560 F.2d 761 (7th Cir. 1977); *Ideal Mutual Ins. Co. v. Winker*, 319 N.W.2d 289 (Iowa 1982); *S.T. Grand, Inc. v. City of New York*, 298 N.E.2d 105 (N.Y. 1973).

As was formerly the practice in civil suits by the government, most courts now "give a judgment based on a guilty plea the same collateral effect as any other criminal conviction, conclusive of all issues that would have been resolved by a conviction following a contested trial." *In re Raiford*, 695 F.2d at 523. Indeed, it has recently been asserted that

> [t]here is now such pervasive acceptance of ['the doctrine precluding the adoption of inconsistent positions in judicial proceedings'] that we can confidently say that the common law as generally understood in the United States gives preclusive effect to a guilty plea....

*Bower v. O'Hara*, 759 F.2d 1117, 1129 (3d Cir. 1975) (Sloviter, J., dissenting). At least one case, however, has denied collateral estoppel effect to a guilty plea: the majority opinion in *Bower* denied such effect not on the traditional ground of mutuality, but because the two judges voting in the majority deemed issues resolved by plea rather than by trial not to have been "fully litigated." *Id.* at 1124-26 (majority opinion). *See also* Restatement (Second) of Judgments § 27 (issue preclusion occurs only when an issue is "actually litigated and determined by a valid and final judgment").

80

We find the reasoning of Judge Sloviter's dissent in *Bower* (and of the other recent federal and state cases) more compelling than that of his colleagues. The "actually litigated" prong of the Second Restatement formula is rooted in the traditional requirement that a party should be estopped only with respect to those matters that were genuinely at issue and genuinely decided in the earlier case. Obviously, a party ought not to be estopped from denying assertions he has not previously had a genuine opportunity to deny, or even those he might inadvertently have failed to deny because they were not particularly important in the context of the prior case. This cannot be said of the essential elements of a serious crime, however, at least not where the defendant's admission to the crime was made upon the advice of competent counsel.

"[A] matter can be 'directly and distinctly put in issue'. . . . by actual litigation. Another way is through pleadings." Hazard, *Revisiting the Second Restatement of Judgments: Issue Preclusion and Related Problems*, 66 Cornell L.Rev. 564, 577-78 (1981), quoted in *Bower*, 759 F.2d at 1130 (Sloviter, J., dissenting). Pleading is an important element in the process of litigation. With respect to issues which were distinctly and directly put at issue by the pleadings, which were central rather than peripheral to the proceeding, and which were essential to the outcome, it hardly makes sense to attach *less* weight to those parts of a judgment that the losing party did not even try to resist than to those on which he merely did not prevail.

The notion that an information followed by a guilty plea does not constitute "full and fair litigation" also gives too little credit to the process by which courts decide whether to accept guilty pleas in serious criminal cases.

> An important characteristic which distinguishes the criminal action terminated by a guilty plea from . . . the ordinary default case in civil proceedings . . . is the requirement that the trial court ascertain a factual basis exists for the plea. . . . [T]he question of criminal liability is fully explored by the parties and the court and a judicial determination is made with respect to the essential elements of the crime.

*Winker*, 319 N.W.2d at 295-96. The practice in the High Court of American Samoa, at least in recent years, is that judges have been more willing to err on the side of recalcitrance than to serve as rubber stamps for arrangements that are acceptable to the parties but not grounded in

81

truth. Both Justices have frequently reminded prosecutors and defense counsel that it is not one of the purposes of plea bargaining to make innocent people plead guilty; and both have rejected plea bargains when it appeared that the accused sincerely believed himself innocent.

Moreover, no criminal information can even be filed in the High Court of American Samoa without a prior judicial determination that there is probable cause to believe the defendant committed the crime with which he is charged. *See* Trial Court Rules of Criminal Procedure, Rule 5.1. In the present case this determination was made by the District Judge after a preliminary examination in which the alleged victim (the present plaintiff) was cross-examined at length by defendant's counsel. It is clear from the transcript of that cross-examination, introduced into evidence in the present case by defendant himself, that the issue of self-defense was a central contention in dispute between the government and the defendant. Defendant litigated the issue and lost in the District Court; he had the opportunity to contest it further in the High Court but chose instead to enter a plea in the High Court, which necessarily admitted the government's contention. After questioning the defendant to ensure that he understood his legal rights and that there was a factual basis for his plea, the Court accepted the plea and entered a judgment of conviction. That judgment resolved all essential issues, including self-defense, as deliberately and finally as a verdict after trial would have done.

Defendant's principal argument is that his guilty plea was entered to avoid trial and possible conviction on even more serious charges. He therefore urges that "[t]he weight that plea carries . . . ought to be minimal." This argument appears to have been frequently raised and uniformly rejected. *See, e.g.*, *Plunkett, supra*; *Raiford, supra*; *Graybill v. United States Postal Service*, 782 F.2d 1567, 1573 n.1 (Fed. Cir. 1986). If defendant had wished to limit the scope of his civil liability without unreservedly admitting his guilt, he could have sought to enter a plea of *nolo contendere*. Such an attempt might have been unsuccessful; the government might not have agreed to such a plea bargain, or the Court might have exercised its discretion to reject the plea. Then again, recognizing a *nolo contendere* plea as deficient in the elements of candor, remorse, and willingness to accept consequences that are among the justifications for judicial leniency in plea-bargain cases, the Court might well have accepted the plea and imposed the maximum legal sentence. *See Fontneau*, 654 F.2d at 9 n.1. In any case, by pleading *nolo contendere* the defendant would have put the Court, the prosecution, and the putative victim (with whom the prosecution often

82

consults before agreeing to plea bargains, and with whom the Court almost always consults in conducting presentence investigations) on advance notice of his intentions with respect to civil liability. He would not now be in the awkward position of asking the Court to accept gracefully its status as a forum for the occasional strategic untruth.[1]

---

[1] See Hazard, *supra*, at 577-78, quoted in *Bower*, 759 F.2d at 1130 (Sloviter, J., dissenting):

> [I]f a proposition is clearly asserted, and if a party is called upon solemnly to admit or deny the proposition, and if the stakes are high enough to assure that he party is serious in dealing with the issue, and if the party then admits or fails to deny the proposition, then he ought to be estopped from controverting it on some other occasion, particularly if that other occasion involves essentially the same transaction. The clearest case for such an estoppel is where a defendant pleads guilty to a substantial criminal charge and then seeks in civil litigation concerning the same transaction to assert that he did not commit the criminal act.

It has been suggested that the "truth-telling" concern raised by Professor Hazard has nothing to do with the "issue preclusion" effect of a judgment, but should instead be characterized as an argument for an altogether different phenomenon called an "evidentiary estoppel." *See Bower*, *supra*, at 1129 (Sloviter, J., dissenting); Restatement (Second) of Judgments § 85 comment b (1982). This analysis holds that "issue preclusion" has to do with avoiding the inefficient allocation of judicial and party resources and should therefore apply only to issues that have actually been tried, but that a solemn judicial admission may nevertheless have an estoppel effect for policy reasons unrelated to the allocation of resources. Perhaps because issue preclusion and evidentiary estoppel would be virtually indistinguishable in practical application, courts have not made the distinction. *See Winker*, 319 N.W.2d at 294.

We believe, however, that the denial of a prior judicial admission presents *both* the problem of resource allocation raised by relitigation of any question already fairly decided *and* the credibility and forum tainting concerns posed by judicial tolerance of solemn inconsistent admissions.

When a party seeks to controvert an issue decided against him in a contested proceeding, he is saying to the Court, "The other judge was wrong. Please hear me out." When he seeks to controvert an issue he could have contested but chose to admit, he says, "I misled the Court, but there were good reasons for it. This time my interests coincide with telling the truth, and I propose to do so."

It is not immediately apparent that judicial resources will be more efficiently spent in relitigation of the second class of cases described above than of the first. If anything, the class of questions actively contested would seem likely to include more close questions --- and therefore more questions wrongly decided and on which relitigation might change the result --- than the class of questions decided by admission. (This assumes only that questions in the latter class were sufficiently central and important not to have been admitted casually or inadvertently.) To the extent that allowing a party to rebut his own deliberate admission also offends the sense of justice, this should be regarded as an independent and additional ground on which to give preclusive effect to judgments based on such admissions.

Neither a guilty plea nor a verdict after trial estops the defendant with respect to any issue not squarely resolved by the judgment. *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558 (1951); *United States v. Guzzone*, 273 F.2d 121 (2d Cir. 1959). With respect to several issues raised by the present action, defendant's criminal conviction works no estoppel. For instance, the plea does not establish what injuries, if any, were inflicted upon plaintiff. Nor does the plea establish that defendant acted intentionally --- an essential element of the tort of battery --- since Assault in the Third Degree can be committed "recklessly" or even "with criminal negligence." A.S.C.A. § 46.3522(a)(1), (a)(4). With respect to these elements plaintiff was bound to present evidence other than the guilty plea, and defendant would have been free to controvert any such evidence.

Instead, however, defendant has chosen to concede the intentional beating and the consequent injuries but to raise a defense that is squarely negated by his guilty plea and the conviction thereon. If, as defendant contends in his answer, he was not the original aggressor in his encounter with plaintiff, and if he used only such force as he reasonably believed necessary to defend himself against an imminent attack by a man with a knife or another deadly weapon, then he was not even arguably guilty of Assault in the Third Degree. *See* A.S.C.A. § 46.3305 ("Use of force in defense of persons"). To the exact extent that such a reasonable belief would constitute a defense to the tort of battery, it was a complete defense to a criminal charge under any of the three applicable subsections of the Assault in the Third Degree statute: "attempts to cause or recklessly causes physical injury to another person" (A.S.C.A. § 46.3522(a)(1)); "with criminal negligence . . . causes physical injury to another person by means of a deadly weapon" (A.S.C.A. § 46.3522(a)(2)); or "recklessly engages in conduct which creates a grave risk of death or serious physical injury to another person" (A.S.C.A. § 46.3522(a)(4)).[2]

---

[2] The plea bargain did not specify under which subsection defendant was pleading guilty, but did specify that he was pleading guilty to a Class A Misdemeanor. The three subsections quoted in the text are those under which Assault in the Third Degree constitutes a Class A Misdemeanor. *See* A.S.C.A. § 46.3522(b). The record of the criminal proceeding—the information, the transcript of the preliminary examination, and the defendant's answer to the question posed to him by the Court prior to accepting the guilty plea—is consistent with a finding of assault under any of the three subsections.

A reading of A.S.C.A. § 46.3522 together with A.S.C.A. § 46.3305, the self-defense statute, yields no possible set of facts consistent with the guilty plea and also with defendant's present contention that his actions were reasonably necessary to prevent an imminent attack by the knife-wielding plaintiff. This is to be expected, for our criminal

Defendant, after a deliberative process suffused with substantive rights and procedural safeguards even more extensive than those available to a defendant in civil litigation, has been affirmatively adjudicated to have perpetrated a criminal assault upon another person. Plaintiff has been affirmatively adjudicated to have been the victim of this assault. Although the victim of a crime is not formally a party to the prosecution, his or her participation is usually essential and often entails personal hardship and even risk. As we have observed, a successful criminal prosecution does not automatically entitle the victim to an award of damages. To relitigate the basic question of who was the perpetrator and who was the victim, however, where this question was necessarily decided by the criminal conviction, would be at best a waste of judicial resources and at worst fundamentally unfair.[3]

## II. Self Defense and Other Justifications

Even if he were not estopped by his guilty plea and criminal conviction, defendant would not have established a justification of self-defense. Neither version of the incident was consistent with such a justification. In plaintiff's version, the attack on him by defendant was unprovoked. Even according to defendant's own version, there was no imminent danger of an attack on him by the plaintiff; rather, plaintiff

---

self-defense statute substantially restates the common law defense to battery and other intentional torts. *Compare* A.S.C.A. § 46.3305 *with Prosser & Keeton on Torts* § 19 at 125-28 (5th ed. 1984). Thus, for instance, tort law would excuse the defendant for using "deadly" force if and only if he reasonably believed "that he is in similar serious danger, and that there is no other safe means of defense." *Prosser & Keeton, supra,* at 127. To the exact extent defendant could establish such a justification in the present action, however, he would not have been guilty of assault or any other crime even if he did use deadly force. *See* A.S.C.A. § 46.3305(b).

[3] Our holding with respect to the collateral estoppel effect of a guilty plea is limited to cases in which the plea was to a charge serious enough to ensure that the plea represented a conscious and deliberate decision to admit rather than to contest the essential elements of the crime. We express no opinion with respect to the effect of a plea to a traffic infraction, or even to a petty misdemeanor punishable by a term of imprisonment of less than six months. (Although the crime to which the present defendant pled guilty was one day short of being a felony, it was well within the class of offenses traditionally characterized as "serious crimes" rather than "petty offenses." *See Codispoti v. Pennsylvania,* 418 U.S. 506 (1974); 18 U.S.C. § 1.)

Nor do we express an opinion on whether estoppel may sometimes be unfair in the circumstances of particular cases, other than to hold that such unfairness cannot be established by showing that a guilty plea was made in the context of a favorable plea bargain. *See generally Parklane Hosiery Co. v. Shore,* 439 U.S. at 329-32.

shouted some nasty things and pulled over to the side of the road, apparently wanting to engage in a fight with knives and guns, and defendant obliged. There was no evidence---even if we believe all of defendant's testimony and disbelieve that of the plaintiff---that defendant could reasonably have believed force, much less the infliction of serious injuries, necessary to avoid imminent harm to himself. This was not even one of those difficult situations in which a person about to be attacked must decide quickly whether to stand his ground or make a safe retreat. No attack was imminent. Defendant could have kept on driving.

The justification for which defendant did present evidence, and for which his attorney made a closing argument, was not self-defense but consent. "Consent ordinarily bars recovery for intentional interferences with person or property. . . . It is a fundamental principle of the common law that *volenti non fit injuria*---to one who is willing, no wrong is done." *Prosser & Keeton on Torts* § 18 at 112 (5th ed. 1984). Although inconsistent with his pleading, defendant's testimony at trial was directed almost exclusively to proving that plaintiff's injuries were the result of a mutual combat freely entered into by both parties.

The justification of consent, unlike that of self-defense, appears to be outside the scope of the estoppel worked by defendant's guilty plea. This is because our criminal law does not, except in a few extraordinary circumstances, allow consent as a justification for the infliction of serious injuries. *See* A.S.C.A. § 46.3523. Defendant's guilty plea neither affirmed nor denied the infliction of serious injuries. Assuming that defendant regarded the injuries as serious---as the present evidence shows beyond doubt they were---he could truthfully have pled guilty to Assault in the Third Degree although believing himself guilty only of a mutual combat and not of an unprovoked attack. He is therefore not estopped to assert this in the present case.

For the same reasons that consent does not work as a justification for the infliction of serious injuries in the criminal context, however, it is also a dubious defense to the present action. A plaintiff's consent to a fist fight will ordinarily bar his recovery for injuries suffered in the fight. Where mutual combat is conducted with weapons calculated to cause death or serious physical injury, however, "[t]he considerable majority of the courts have [held] . . . that the consent given will . . . not protect the defendant against a civil action for the damages inflicted." *Prosser & Keeton, supra*, § 18 at 122. Each combatant "is civilly liable to the other . . . and the fact that the parties voluntarily engaged in combat is no defense to an action by either of them to recover damages

for personal injuries inflicted upon him by the other." *Condict v. Hewitt*, 369 P.2d 278, 279 (Wyo. 1962).

This rule leads to the odd result that each of two combatants could recover damages against the other, each having to pay in proportion to the success of his efforts. The rule has been criticized, and among courts "[a] minority, with the support of the Restatement, have held that the consent will defeat the civil action." *Prosser & Keeton, supra*, § 18 at 122; *see* Restatement (Second) of Torts § 60. It is arguable, however, that "no one should have the capacity to consent to . . . an invasion likely to result in his death." *Prosser & Keeton, supra*, § 18 at 123. Moreover, "the tort action may often be helpful in reducing the incidence of damaging events . . . ." *Id.* at 124.

The present case, in which consent was not pled and counsel have not briefed or argued the question, does not seem an appropriate one in which to choose between the majority rule and the Restatement rule with respect to consent as a justification for the use of deadly force. Nor is it necessary to decide this question, for the preponderance of the evidence does not support defendant's contention that plaintiff consented to a fight with deadly weapons.

Each of the two parties told a story that was neither incoherent nor internally inconsistent. It might have happened either way. In his closing argument, counsel for defendant suggested that a basis for choosing between the two stories was afforded by the pattern of plaintiff's injuries: that plaintiff, who is right-handed, held up his left hand to shield himself from defendant's blows must mean he was holding a knife in his right hand. This inference seems tenuous. The use of the left hand as a shield could be explained just as well by its having been the hand closer to the blunt object that was about to come down on the plaintiff; by a conscious or instinctive desire to have the right hand free for hitting or grappling; or by plaintiff's being a person who does not function well under pressure. Indeed, the pattern of injuries could just as easily call the defendant's story into question. If, as he testified, his goal was merely to disarm the plaintiff, then perhaps he should have directed more of his blows at the alleged knife hand and fewer at the limb being used to shield plaintiff's head and body.

Left to assess the inherent likelihood or unlikelihood of each story, we find it most difficult to believe that a man with a knife freely consented to mutual combat---indeed, according to defendant, actively initiated such combat---with a man holding a gun. Even assuming that

plaintiff was willing to fight before the gun was introduced into the picture, we cannot conclude (as we must in order to find consent as a legal justification) that such consent continued as defendant walked toward plaintiff carrying the gun, with no indication that he intended to use the gun as a bludgeon rather than in the ordinary way. We would find it still more difficult to believe that plaintiff began the actual combat by swinging a knife at an adversary who was then holding a rifle or shotgun. Although defendant presented evidence designed to show that plaintiff had many undesirable character traits, he was not proved to be crazy.

Moreover, defendant's alternative plea of "defense of property," although frivolous insofar as it purports to present a justification for the use of deadly force,[4] does suggest the most plausible explanation for the attack. According to defendant's answer, plaintiff had "come onto the land of [defendant] and destroyed vegetation thereon and had attempted to lay claim to ownership thereof." Some weeks before the incident that concerns us here, plaintiff had attempted to conduct a survey of this land, presumably in order to offer it for registration in accordance with A.S.C.A. § 37.0101 et seq. Defendant's father, generally recognized as the highest chief in Leone and vicinity, appeared and announced that he did not intend to let plaintiff conduct the survey. Plaintiff became quite excited and spoke disrespectfully to defendant's father. Defendant then displayed his gun and told plaintiff to leave. Plaintiff did so, with a parting statement to the effect that he would fight the defendant at some future time. According to plaintiff, this was an invitation to fight with fists, not deadly weapons.

Defendant's version of this earlier encounter is that he went for his gun after plaintiff had "assaulted" him by "waving the knife around." It is undisputed that plaintiff had a bush knife (probably of the "cane knife" variety) at the survey; such a knife is an essential thing to have at a survey of bush or agricultural land. Neither plaintiff nor the other witness who was present at the survey --- defendant's witness and relative Ioane Atofau --- said anything about plaintiff waving a knife. Nothing

---

[4] "The use of force is not privileged when it is apparent that no immediate interference with the property is threatened, or that all danger is past." *Prosser & Keeton, supra,* § 21 at 132. Plaintiff was some distance from the land in question, and heading away from it, when the encounter with defendant occurred. Even more important, "since the law has always placed a higher value upon human safety than upon mere rights in property, it is the accepted rule that there is no privilege to use any force calculated to cause death or serious bodily injury to repel the threat to land . . . ." *Id.*

happened at this encounter to justify the future use of deadly force upon plaintiff, or to suggest that plaintiff was willing to engage in any sort of combat beyond fisticuffs. (Indeed, plaintiff's prompt compliance with defendant's order to leave was almost certainly motivated by a healthy respect for firearms.) What did happen, as is clear from defendant's own pleading and testimony, was that the incident left defendant with a strong sense of righteous indignation and a belief that plaintiff would keep on causing trouble until he was taught a lesson. At the time he was attacked, plaintiff was apparently returning from yet another visit (in defendant's view, a trespass) to the land claimed by defendant.

The evidence is certainly consistent with the view that plaintiff is capable of being a most exasperating person. He should not have insulted defendant's father. Nor, if the disputed land did belong to defendant, should plaintiff have gone upon it or claimed it as his own. People who do things like these may be shunned, sued, vilified, and in appropriate cases arrested. But they may not have their arms broken.

We conclude that plaintiff's injuries resulted from an unjustified battery committed by the defendant.

### III. Damages

Plaintiff asserted but did not prove that his injuries resulted in a substantial loss of income. The tree trimming business which was his sole source of income at the time appears to have done better in the months after the attack than it had ever done before.

Plaintiff did prove that he has endured, and continues to endure, considerable pain and suffering. He has been subjected to a severe beating, to bruises, broken bones, and a dislocated elbow joint, to the physical intrusion and emotional distress occasioned by surgery, and to several days of hospitalization and an extended period of convalescence during which at least one arm was in a cast. He now has a large scar on the outside of his left arm and a metal plate inside it, both of which will remain permanently. There is a substantial partial disability in the left arm. Plaintiff faces a further choice between undergoing a major surgical procedure which will probably, although by no means certainly, restore much or all of the lost function in the arm, or putting up with the partial disability for the rest of his life. Either of these choices will involve further pain and suffering.

We assess plaintiff's damages at $20,000. This assessment will be reduced by the $1,000 which, according to the record in the criminal case, defendant has already paid plaintiff as restitution in lieu of a fine.

We make no award of punitive or exemplary damages. In the circumstances of this case, the deterrent function of such awards will be served by the assessment of $20,000 in actual damages, and the prison sentence is adequate punishment.

*IV. Order*

Judgment will enter for plaintiff and against defendant in the amount of $19,000.

It is so ordered.

